1  ROBBINS LLP
   BRIAN J. ROBBINS (190264)
2  brobbins@robbinsllp.com
   STEPHEN J. ODDO (174828)
3  soddo@robbinsllp.com
   ERIC M. CARRINO (310765)
4  ecarrino@robbinsllp.com
   5040 Shoreham Place
5  San Diego, CA 92122
   Telephone: (619) 525-3990
6  Facsimile: (619) 525-3991

7  Attorneys for Plaintiff

8                     UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10 | BRAD SHUMAN, Derivatively on Behalf      | ) | Case No.:
   | of LYFT, INC.,                           | )
11 |                                          | )
   |                         Plaintiff,       | ) | VERIFIED STOCKHOLDER DERIVATIVE
12 |        v.                                | ) | COMPLAINT FOR BREACH OF
   |                                          | ) | FIDUCIARY DUTY, UNJUST
13 | LOGAN GREEN, JOHN ZIMMER, BRIAN          | ) | ENRICHMENT, AND CONTRIBUTION
   | ROBERTS, PRASHANT AGGARWAL,              | )
14 | ANN MIURA-KO, VALERIE JARRETT,           | )
   | DAVID LAWEE, MARY AGNES                  | )
15 | WILDEROTTER, HIROSHI MIKITANI, and       | )
   | BEN HOROWITZ,                            | )
16 |                                          | )
   |                         Defendants,      | )
17 |                                          | )
   |        -and-                             | )
18 |                                          | )
   | LYFT, INC., a Delaware Corporation,      | )
19 |                                          | )
   |                 Nominal Defendant.       | )
20 | _____ | ) | DEMAND FOR JURY TRIAL

21

22

23

24

25

26

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Unjust Enrichment, and Contribution.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.    This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Lyft, Inc. ("Lyft" or the "Company") against certain of its officers and directors for breaches of fiduciary duty, unjust enrichment, contribution, and violations of law.  These wrongs resulted in hundreds of millions of dollars in damages to Lyft's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed Lyft to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.    Lyft operates a peer-to-peer marketplace for on-demand ridesharing in the United States and Canada.  The Company connects passengers seeking transportation services with drivers willing to provide those services.  Lyft has more recently expanded to offer its customers the ability to rent electric bicycles ("e-bikes") and scooters.

3.    This action arises out of the disregard for the safety of the Company's customers, both passengers and drivers.  There has been an epidemic among the ridesharing companies of sexual assault and harassment against females, whether they are drivers or passengers.  Lyft has not been immune.  As explained herein, the Company is facing a legion of lawsuits from females claiming they were harassed, assaulted, or worse while using the Lyft application (or "app").  The fault, they claim, is the Company's failure set up appropriate internal controls to protect the victims, such as in-car video monitoring and fingerprint-based background checks.  In addition, Lyft failed to adequately investigate customer complaints of sexually inappropriate behavior.  In addition to being morally repugnant, this failure to protect female drivers and riders runs counter to Lyft's mission critical attempts to distinguish itself as the responsible rideshare operator.

4.     Further, Lyft's e-bikes have been plagued with safety issues.  Most notably, the Company failed to properly install the braking mechanisms in its e-bikes.  The result was significant injuries to riders when the brakes failed to activate properly.  Lyft's failure to take such basic precautions for its e-bike riders once again runs contrary to messaging and reputation the Company was hoping to cultivate.

5.     The fault in these oversight failures lies squarely with the Individual Defendants (as defined below).  However, these defendants did more than breach their fiduciary duties of loyalty by failing to implement appropriate internal controls.  They actively misled the market.  In particular, in the Offering Documents (as defined below) issued in connection with Lyft's initial public offering (the "IPO") and the statements that immediately followed, these defendants presented the possibility of negative safety issues as a risk that had the potential to arise sometime in the future.  The truth was, however, that the above issues had already materialized.  Thus, the Individual Defendants misled the market by presenting a present fact as something that could potentially happen in the future.

6.     As the public learned about Lyft's issues with sexual harassment and assault and its e-bikes, the Company's stock price precipitously declined well below the IPO price of $72 per share and never recovered.  Indeed, the Company's stock currently trades at less than $45 per share.

7.     As a direct result of this unlawful course of conduct, Lyft is now the subject of a federal securities class action lawsuit in the U.S. District Court for the Northern District of California on behalf of investors who purchased or acquired Lyft's shares traceable to the IPO (the "Securities Class Action"). On September 8, 2020, the court in the Securities Class Action denied the defendants' motion to dismiss, substantially increasing the likelihood that Lyft will have to pay a substantial amount of money to resolve the action.

## JURISDICTION AND VENUE

8.     Jurisdiction is conferred by 28 U.S.C. §1331 because plaintiff's claims raise a federal question under section 11(f) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77k (f)(1), and section 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78u-4(f).

9.     The Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. §1367.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

10.   This Court also has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.   Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Lyft is incorporated in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Lyft, occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## INTRADISTRICT ASSIGNMENT

12.   A substantial portion of the transactions and wrongdoings which give rise to the claims in this action occurred in the County of San Francisco.  A related derivative action is pending in the Oakland division of this Court and therefore, this action is properly assigned to the Oakland division.

## THE PARTIES

**Plaintiff**

13.   Plaintiff Brad Shuman has continuously been a stockholder of Lyft since March 2019.

**Nominal Defendant**

14.   Nominal defendant Lyft is a Delaware corporation with principal executive offices located at 185 Berry Street, Suite 5000, San Francisco, California.  Lyft operates a peer-to-peer marketplace for on-demand ridesharing by connecting riders to drivers through its proprietary smartphone application. Lyft conducted the IPO of its common stock between March 28, 2019 and April 2, 2019.  As of December 31, 2019, Lyft had approximately 5,683 employees.

**Defendants**

15.   Defendant Logan Green ("Green") is Lyft's Co-Founder, Chief Executive Officer, and a director and has been since March 2007.  Defendant Green is named as a defendant in two related securities class actions that allege he violated sections 11, 12(a)(2), and 15 of the Securities Act.  Lyft paid defendant Green the following compensation as an executive:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Year | Salary | All Other Compensation | Total |
|---|---|---|---|
| 2019 | $441,346 | $360,218 | $801,564 |

16.     Defendant John Zimmer ("Zimmer") is Lyft's Co-Founder and has been since March 2007; director and has been since June 2010; President and has been since March 2013; and Vice Chair and has been since January 2019.  Defendant Zimmer was also Lyft's Chief Operating Officer from July 2008 to March 2013.  Defendant Zimmer is named as a defendant in two related securities class actions that allege he violated sections 11, 12(a)(2), and 15 of the Securities Act.  Lyft paid defendant Zimmer the following compensation as an executive:

| Year | Salary | All Other Compensation | Total |
|---|---|---|---|
| 2019 | $441,346 | $1,571,104 | $2,012,450 |

17.     Defendant Brian Roberts ("Roberts") is Lyft's Chief Financial Officer and has been since November 2014.  Defendant Roberts was also Lyft's Senior Vice President, Partnerships and Corporate Development from October 2014 to November 2014.  Defendant Roberts is named as a defendant in two related securities actions that allege he violated sections 11, 12(a)(2), and 15 of the Securities Act.  Lyft paid defendant Roberts the following compensation as an executive:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2019 | $441,346 | $9,123,624 | $2,664 | $9,567,634 |

18.     Defendant Prashant Aggarwal ("Aggarwal") is Lyft's Chairman of the Board of Directors (the "Board") and has been since January 2019 and a director and has been since February 2016. Defendant Aggarwal is also a member of Lyft's Audit Committee and has been since at least March 2019. Defendant Aggarwal is named as a defendant in two related securities actions that allege he violated sections 11, 12(a)(2), and 15 of the Securities Act.  Lyft paid defendant Aggarwal the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $82,581 | $259,979 | $342,560 |

19.     Defendant Ann Miura-Ko ("Miura-Ko") is a Lyft director and has been since March 2016. Defendant Miura-Ko was also a Lyft director from June 2010 to May 2013.  Defendant Miura-Ko is named as a defendant in two related securities actions that allege she violated sections 11, 12(a)(2), and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

15 of the Securities Act.  Lyft paid defendant Miura-Ko the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $38,817 | $259,979 | $298,796 |

20.     Defendant Valerie Jarrett ("Jarrett") is a Lyft director and has been since July 2017. Defendant Jarrett is also a member of Lyft's Audit Committee and has been since at least March 2019. Defendant Jarrett is named as a defendant in two related securities actions that allege she violated sections 11, 12(a)(2), and 15 of the Securities Act.  Lyft paid defendant Jarrett the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $41,861 | $259,979 | $301,840 |

21.     Defendant David Lawee ("Lawee") is a Lyft director and has been since November 2017. Defendant Lawee is named as a defendant in two related securities actions that allege he violated sections 11, 12(a)(2), and 15 of the Securities Act.  Lyft paid defendant Lawee the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $49,472 | $259,979 | $309,451 |

22.     Defendant Mary Agnes Wilderotter ("Wilderotter") is a Lyft director and has been since May 2018.  Defendant Wilderotter is also Chair and a member of Lyft's Audit Committee and has been since at least March 2019.  Defendant Wilderotter is named as a defendant in two related securities actions that allege she violated sections 11, 12(a)(2), and 15 of the Securities Act.   Lyft paid defendant Wilderotter the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $49,472 | $259,979 | $309,451 |

23.     Defendant Hiroshi Mikitani ("Mikitani") was a Lyft director from March 2015 to August 2020.  Defendant Mikitani is named as a defendant in two related securities actions that allege he violated sections 11, 12(a)(2), and 15 of the Securities Act.   Lyft paid defendant Mikitani the following compensation as a director:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $30,444 | $259,979 | $290,423 |

24.     Defendant Ben Horowitz ("Horowitz") was a Lyft director from June 2016 to June 2020. Defendant Horowitz is named as a defendant in two related securities actions that allege he violated sections 11, 12(a)(2), and 15 of the Securities Act.   Lyft paid defendant Horowitz the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2019 | $36,914 | $259,979 | $296,893 |

25.     The defendants identified in ¶¶15-17 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶15-16, 18-24 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶18, 20, 22 are referred to herein as the "Audit Committee Defendants." Collectively, the defendants identified in ¶¶15-24 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

26.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Lyft and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Lyft in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interest of Lyft and not in furtherance of their personal interest or benefit.

27.     To discharge their duties, the officers and directors of Lyft were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Lyft were required to, among other things:

(a)     implement controls that are meant to ensure the safety of the people using the Company's products;

(b)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of

the Company's stock; and

(c)      remain informed as to how Lyft conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

28.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Lyft, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

29.     The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to engage in improper practices that wasted the Company's assets, and caused Lyft to incur substantial damage.

30.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Lyft, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Lyft has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

31.     In addition to these duties, under its Charter, the Audit Committee Defendants, defendants Aggarwal, Jarrett, and Wilderotter, owed specific duties to Lyft to assist the Board in overseeing the Company's "accounting and financial reporting processes and internal controls," "compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements)," and "ethical compliance programs, including the adequacy and effectiveness of initiatives related to values and ethics."  In addition, the Audit Committee's Charter provides:

**RESPONSIBILITIES**

The following are the principal recurring responsibilities of the Committee. The Committee may perform such other functions as are consistent with its purpose and applicable law,

rules and regulations and as the Board may request. In carrying out its responsibilities, the Committee believes its policies and procedures should remain flexible, in order to best react to changing conditions and circumstances.

\*       \*       \*

5.  Review Financial Statements. The Committee shall review and discuss the following with management, the internal auditors, if applicable, and the independent auditor, as applicable:

- The Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K.

- The results of the independent audit and the quarterly reviews of the Company's financial statements, and the independent auditor's opinion on the annual financial statements.

- Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles.

- Analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements.

- The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

- Any problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, and management's response.

\*       \*       \*

8.  Earnings Press Releases and Earnings Guidance. The Committee will review, in general, earnings press releases, and review and discuss with management and the independent auditors policies with respect to earnings press releases (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), financial information and earnings guidance provided to the public, analysts and ratings agencies.

9.  Internal Controls. The Committee shall review and discuss with management, the internal auditors, and the independent auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the internal auditors, if applicable, or management and any special audit steps adopted or changes required in light of any material control deficiencies, the reports and certifications regarding internal control

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

over financial reporting and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.

10. <u>Disclosure Controls and Procedures</u>. The Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures and the reports and certifications over disclosure controls and procedures.

*       *       *

12. <u>Risk Assessment and Risk Management</u>. The Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management pertaining to financial, accounting and tax matters. The Committee will also provide oversight of risks and exposures associated with cybersecurity matters. The Committee will also review the Company's risk management framework and programs, as well as the framework by which management discusses the Company's risk profile and risk exposures with the Board and its committees.

13. <u>Legal and Regulatory Compliance</u>. The Committee shall:

- Review and discuss with management, the internal auditors, if applicable, and the independent auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Business Conduct and Ethics, compliance with anti-bribery and anti-corruption laws and regulations, and compliance with export control regulations and (ii) reports regarding compliance with applicable laws, regulations and internal compliance programs.

- Discuss with management and the independent auditor any correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.

- Discuss with a senior member of the Company's legal department any legal matters that may have a material impact on the financial statements or the Company's compliance procedures.

<strong><u>OVERVIEW</u></strong>

32.     Lyft operates a peer-to-peer marketplace for on-demand ridesharing in the United States and Canada.  The Company offers a multimodal platform that provides riders, personalized and on-demand access to various transportation options.  Essentially, through its mobile application, Lyft matches passengers with drivers.  The Company's main competitor is Uber Technologies, Inc. ("Uber").  Uber is substantially larger than Lyft.  The Company has chosen to compete with Uber by, among other

steps, building a reputation as a safer more socially conscious company.  Accordingly, the Company's reputation is of key importance to it.

33.    The Individual Defendants have risked this reputation and exposed Lyft to significant financial harm.  As detailed below, the Individual Defendants allowed Lyft to operate in an unsafe manner by, among other things, having inadequate safeguards for its female customers and drivers and for its users of the Company's e-bikes.  They then compounded this wrongdoing by presenting misleading information about both to the investing public.  They misled the market about supposed key performance indicators, most notably "revenue as a percentage of bookings," as well as the Company's losses, and market share.

**Lyft Fails to Take Appropriate Steps to Protect Its Female Customers and Drivers**

34.    Lyft has touted "trust and safety" as a key benefit to riders and that it is committed to "social responsibility."  The Company claimed that "[w]e have built a brand that balances our mission-driven ethos with a friendly, hospitality-oriented personality."  Among other steps the Company claimed it took to keep customers safe, Lyft stated that "we have run extensive background and safety checks on drivers before they are approved to provide rides on our platform."  The Offering Documents[1] also highlighted the Company's supposed commitment to trust and safety, stating:

> **Our Commitment to Trust & Safety**
>
> A strong guiding principle since day one has been to build a community that drivers and riders trust. Trust is the foundation of our relationship with drivers and riders on our platform, and we take significant measures every day that are focused on their safety. This dedication led our customer support to be recently named number one in Newsweek's 2019 America's Best Customer Service rankings for the Taxi and Peer-to-Peer Ridesharing category.
>
> \*        \*        \*
>
> *Trust and Safety.* Safety is our top priority, and establishing a community built on trust and safety is paramount to our success.
>
> \*        \*        \*

---

[1] Lyft filed the draft Registration Statement on Form S-1 with the SEC on March 1, 2019.  After several amendments, the SEC declared the Registration Statement effective on March 28, 2019.  Lyft filed the Prospectus with the SEC on March 29, 2019.  The Registration Statement and Prospectus are collectively referred to herein as the "Offering Documents."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

*Trust and Safety.* In the beginning, our Co-Founders interviewed every driver personally because establishing trust and safety has always been the top priority in building a successful community. Additionally, since day one we have run extensive background and safety checks on drivers before they are approved to provide rides on our platform. During the ride, we have designed numerous safety features into the Lyft experience, such as Share Route, which allows riders to share their location with family and friends, and Amp, a dashboard beacon that helps riders identify their drivers' vehicles. To help us uphold high community standards, we give both drivers and riders the opportunity to rate each other after a ride. If a driver is rated three stars or below, Lyft reviews the situation and contacts the rider if necessary to follow-up on the ride experience.

35.     Despite the importance the Company placed on "safety," drivers for Lyft have committed an alarming amount of sexual assaults against its passengers.  Some of these victims have brought lawsuits against the drivers and Lyft.  The victims often claim that Lyft was at least negligent in its handling of the individuals that drive for it and the safety of the Company's customers.

36.     These allegations are high profile and have damaged the Company's reputation and, more importantly, caused significant harm to the victims.  For instance, on August 2, 2019, the *Washington Post* published an article titled "How Lyft Lost the Trust of #DeleteUber Women Who Thought It Was 'Woke'."  The article explained that "[i]n interviews, nearly a dozen women from across the country described Lyft's response to allegations of sexual harassment as tone deaf and inadequate…."  The Company has, according to the article, admitted that its "response had fallen short in some instances" and it "could do more in some cases of alleged sexual harassment."  In fact, the Lyft mobile app is or was missing key features that were available on Uber for a substantial amount of time, such as a "panic button" that automatically dials 911.  It took Lyft a year after Uber acted to add recurring driver background checks.

37.     In September 2019, Lyft was sued by fourteen women in a purported mass tort action.  These women claimed that they were all sexually assaulted by the Company's drivers and Lyft has known since 2015 that drivers were sexually assaulting and raping female customers.  The complaint in that action highlights the lack of true screening process for drivers.  It also noted that Lyft did not have a zero-tolerance policy for sexual misconduct and does not require non-harassment training.  Lyft also does not monitor the rides as they take place.  According to the complaint in the action, in one year, there were close to 100 reports of Lyft drivers sexually assaulting passengers in California.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

38.     This mass tort action was one of just numerous lawsuits pending against the Company. Lyft is a defendant in at least one class action lawsuit on behalf of victims that were sexually assaulted by the Company's drivers.  This class action, pending in the Superior Court of California, San Luis Obispo County, was brought by three woman from different areas of California all claiming they were sexually assaulted by Lyft drivers.  It also alleges that Lyft knew its security screening was deficient, that its background checks were below industry standards, and that its derivers were not trained on sexual harassment and abuse standards.

39.     The allegations in the lawsuits are supported by news reports.  For example, a 2018 CNN investigation found that at least eighteen then current Lyft drivers in the United States had been accused of sexually assaulting or abusing their passengers, four of which had been convicted.  An article in the *Cincinnati Enquirer* stated that a man remained a driver for months after he was arrested for first-degree sexual abuse.  After a number of sexual assault incidents involving Uber and Lyft drivers in the Seattle, Washington, area, the Metropolitan King County Council stated that it is investigating the Company's screening practices.

40.     It is not just customers that are sexually assaulted.  According to reports, female drivers are also often victims.  When these female drivers report the assaults to Lyft, the Company provides little support.  For instance, an article in the *Guardian* titled "Female Drivers Feel Abandoned by Uber and Lyft After Reporting a Sexual Assault," details the experiences of female drivers, including one that was assaulted by a passenger.  When the driver reported the incident to Lyft, the Company merely stated it suspended the passenger's account.  In another instance, a female driver reported that a passenger brought a gun into her car, who then tried to coerce the driver to drive around town for him.  When she reported the incident to Lyft, it took the Company five days before responding.

41.     Lyft's poor record has drawn the attention of members of Congress.  On October 1, 2019, Senator Richard Blumenthal issued a series of statements on Twitter that were highly critical of Lyft. According to Senator Blumenthal, Lyft "tell[s] employees to dissuade victims from notifying the authorities."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

42.     Uber, Lyft's main competitor, issued a report on the sexual assaults that occur in rides using the Uber app, revealing thousands of instances of sexual assault.[2]  Lyft has yet to provide a similar report.  However, due to the large overlap of drivers for both cars, it is likely that Lyft has similar numbers.

**Lyft's Recalls Thousands of E-Bikes Due to Safety Issues**

43.     In 2018, Lyft purchased Bikeshare Holdings LLC ("Motivate"), the country's largest bikesharing company, for $250.9 million.  As part of the Motivate acquisition, Lyft promised to invest another $100 million to further extend the bikesharing system.  Lyft stated that Motivate accounted for roughly 74% of the bikeshare trips in the U.S. and operated networks in New York City, San Francisco, Chicago, and other metro areas.  The Company's purchase of Motivate closed on November 30, 2018.

44.     Motivate was a key acquisition for the Company and repeatedly touted in its public statements.  For instance, the Offering Documents stated: "Today, our offerings include ***an expanded set of transportation modes, such as access to a network of shared bikes and scooters for shorter rides and first-mile and last-mile legs of multimodal trips.***"

45.     Specifically highlighting the purported safety and value of the newly acquired bike sharing program, the Registration Statement stated in pertinent part as follows:

> • Bikes and Scooters.  We have a network of shared bikes and scooters in a number of cities to address the needs of riders who are looking for lower priced, more active and often more efficient options for short trips during heavy traffic.  ***These modes can also help supplement the first mile and last mile of a multimodal trip with public transit.***
>
>         \*        \*        \*
>
> ***Lyft Bikes and Scooters***
>
> Our network of shared bikes and scooters is our first extension to modes addressing shorter trip lengths.  Bikes and scooters are also the most affordable transportation options on our platform to date.  Our strategy is to work closely with cities on the deployment of bikes and scooters.  We are committing to high safety standards for the ope1·ation of bikes and scooters on our platform to best serve our riders and broader communities.  As such, we

---

[2]  Kate Conger, *Uber Says 3,045 Sexual Assaults Were Reported in U.S. Rides Last Year*, N.Y. Times (Dec. 5, 2019), https://www.nytimes.com/2019/12/05/technology/uber-sexual-assaults-murders-deaths-safety.html.

partner with cities and organizations to provide capital and technology solutions that expand protected bike lanes and reduce speeding.

We also work closely with cities to offer the Lyft Community Pass, a discount program that includes unlimited, 30-minute rides to qualified, low-income residents in our service areas for an easy, affordable way to get around.

*LyftBikes*

Lyft bikes are standard and electric pedal-assist bicycles. ***Through our acquisition of Motive, the largest bike sharing platform in the United States, we are well-positioned to lead sustainable mobility in the markets we serve.*** This platform brings ***expertise in managing bike share systems*** in partnership with cities and local governments across the country, currently operating in nine major cities across the United States. In 2017, there were more than 35 million bike share trips in the United States, of which 74% were on Motivate systems.

46.     The Registration Statement specifically emphasized the new bikesharing service in its list of "Powerful Trends Enabling Change," stating in pertinent part as follows:

***Emergence of New Modes of Transportation.*** New modes of shared transportation are being deployed and are improving the consumer experience by enabling riders to optimize across preferences including cost, comfort and time. ***For example, networks of shared bikes and scooters provide affordable options, potentially more efficient first-mile and last-mile rides and access for communities that have been historically underserved.*** We believe that in the future, fleets of autonomous vehicles will unlock a new mode of transportation that will complement existing modes on scaled TaaS networks.

47.     The Motivate acquisition and Lyft's growing bikesharing program was also prominently highlighted in the display of the Company's growing revenues:



48.     The Registration Statement also promoted the new bikesharing service prominently in the Company's business and financial growth plan then underway, stating in pertinent part as follows:

***Our Growth Strategy***

U.S. consumers spend over $1.2 trillion on transportation annually. We are in the very early phase of capturing this large opp01iunity. Our key growth strategies include our plans to:

• ***Grow Our Rider Base***. We see significant opportunity to continue to grow our rider base. We intend to drive organic adoption in our rider base by continuing to make investments in our brand and growth marketing to increase consumer awareness.  We also offer discounts for first time riders to try Lyft and incentives for existing drivers and riders to refer new riders, and we plan to continue to add density to our ridesharing marketplace by attracting and retaining drivers to our platform to further improve the rider experience. Additionally, we are expanding our platform coverage beyond the geographies and markets

we currently serve. We also believe we will benefit from demographic trends, such as the growing percentage of the population who are born as digital natives accustomed to on-demand and shared offerings.

• *Increase Our Use Cases.* Increase Our Use Cases. We continuously work to extend our offerings to make Lyft the TaaS network of choice across an expanding range of use cases. We offer products to simplify travel decision-making and expand the potential uses for our platform, such as subscription plans, commuter services, *first-mile and last-mile services* and university safe rides programs. We also provide centralized tools and solutions tailored to businesses, such as our Concierge offering, which enables organizations to manage the transportation needs of their customers and employees.

• *Expand Our Multimodal Offerings.* We continue to make Lyft an everyday experience for riders through our *multimodal platform* designed to address a wide range of transportation needs. By expanding our multimodal offerings, we can offer riders options that best fit their criteria directly from the Lyft app, which increases rider engagement

• *Grow Our Share of Rider Transportation Spend.* As we continue to increase rider loyalty to our brand and expand our use cases and the breadth of our multimodal offerings, we believe we will also increase our share of rider transportation spend.  For example, a rider may start using our ridesharing offering for a night out and then choose Lyft again for travel to the airport. Once they have experienced the reliability and convenience of Lyft, they may incorporate Shared Rides into their daily commute and, *for shorter rides or when connecting to public transit, rent one of our shared bikes or scooters.* Usage of our platform has typically increased over time. For example, riders who took their first ride on our platform in 2015, or our 2015 cohort, took an aggregate of 25.1 million rides during 2015.  In 2018, this 2015 cohort took an aggregate of 66.9 million rides, representing 266% of the rides taken by the cohort in 2015.

• *Invest in Technology to Strengthen Our Network and Increase Efficiency.* Our investments in proprietary technologies and predictive analytics leverage insights derived from the rich set of data generated by our platform. These investments allow us to deliver an affordable, convenient and high-quality experience for our riders and increase the earnings of drivers. Our investments in mapping, routing, payments, in-app navigation and matching technologies are key to integrating technology and leveraging data science into our platform in order to increase the efficiency of our platform and improve safety. In addition, we are investing in autonomous technology, which we believe will be a critical part of the future of transportation.

• *Pursue M &A and Strategic Partners/tips. In November 2018, we acquired Motivate, the largest bike sharing platform in the United States.*  We will continue to selectively pursue acquisitions that contribute to the growth of our current business, help us expand into adjacent markets or add new capabilities to our platform. We believe drivers and riders on our platform will also benefit from a broader partner ecosystem that expands our marketing and loyalty programs and employee ride solutions. We have built strong relationships with transportation suppliers, state and local governments and technology solutions providers.

\*       \*       \*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

We are continuing to invest in the future, both organically acquisitions of complementary businesses. ***We are investing in the expansion of our scooter network and have expanded into shared bikes with our recent Motivate, the largest bike sharing platform in the United States.***

49.   When discussing Motivate, the Offering Documents expressly emphasized the ***safety*** of the design of the newly acquired bike sharing program, and how that investment would continue to contribute to Lyft's business growth and profitability, stating in pertinent part as follows:

*Investments in Network of Shared Bikes and Scooters and Autonomous Development*

We have made, and intend to continue to make, significant investments in new modes of transportation to grow the scale of our operations and enhance our multimodal platform. ***We believe that in order to offer a best-in-class multimodal platform, we have to invest in bikes and scooters that meet or exceed industry standards of safety and performance and offer a superior rider experience.*** We expect these investments will require up front capital expenditures and result in substantial depreciation over time as we introduce new generations of bikes and scooters.

\*      \*      \*

***Lyft Bikes and Scooters***

Our network of shared bikes and scooters is our first extension to modes addressing shorter trip lengths. Bikes and scooters are also the m transportation options on our platform to date. Our strategy is to work closely on the deployment of bikes and scooters. ***We are committing to high safety standards for the operation of bikes and scooters on our platform to best serve broader communities.*** As such, we partner with cities and organizations to provide capital and technology solutions that expand protected bike lanes and reduce speeding. We also work closely with cities to offer the Lyft Community Pass, a discount program that includes unlimited, 30-minute rides to qualified, low-income residents in our service areas for an easy, affordable way to get around.

\*      \*      \*

***The ways we promote safety include:***  '

• ***Bikes and Scooters.*** Safety is a key tenet that guides our work with bikes and scooters. We are providing the necessary education and support for all riders and are working with partners to provide the capital and technology solutions to expand protected bikes lanes and reduce speeding. We are working with organizations, like Together For Safer Roads, that collaborate with local bike and pedestrian advocates to help protect our community members. We are also giving away free helmets in select markets for our riders.

50.     Accordingly, the Individual Defendants knew of both the importance of the bikesharing program to the Company and that the bikes were safe.  Yet, they allowed the Company's e-bikes to operate without proper braking systems and other technical flaws.

51.     In 2018, Motivate began rolling out e-bikes to the markets it served.  For example, New York City began receiving e-bikes in August 2018.  Lyft had hoped to have 4,000 e-bikes in New York City by June 2019, part of a $100 million expansion of Motivate's bikesharing in New York.  However, in April 2019, it was reported that Lyft was pulling the e-bikes in New York City, Washington, D.C., and San Francisco due to safety issues with the e-bikes.  The Company blamed the recall on an issue with the e-bikes' "braking systems."  Then, in July 2019, it was reported that Lyft was pulling its e-bikes because the batteries on the bicycles could catch fire.

52.     The e-bike brake maker, Shimano, placed the blame for the braking problems squarely on Lyft.  Shimano stated that the e-bikes required a "power modulator" to ensure proper function, a device that was not on Lyft's e-bikes.  Shimano further stated that its user and deal manual explicitly warned that "if the hub is not equipped with the power modulator, the braking force may be excessively applied." In particular, Shimano stated:

> Shimano provides specification requirements for bicycle manufacturers to refer to when designing bicycles. When designed and assembled to these specifications the brakes perform to global standards. With regards to this specific case, based on the information we have, *this is not a Shimano brake issue* as the specification requires the use of a power modulator for this brake. It appears this specification was not followed by manufacturers of some of the bicycles in question.

53.     *Bicycling Magazine* spoke with a Motivate bike mechanic who said "employees were not trained to work with the electronic braking systems or e-brakes in general.  As reports of crashes came in, mechanics were told to run through a series of basic maintenance tests, including torquing and re-greasing the brakes.  None of these seemed to work."  The mechanic further stated, "I do believe it was a fundamental lack of knowledge about what was going on[.] ...  It seems like we were getting repairs into the shop before most mechanics knew how to work on them," and that "[t]he e-bikes seemed a bit rushed, almost like they were trying to make it out first rather than taking the time to do things right."

54.     Similarly, a Citi Bike employee with knowledge of the electric bikes told the *New York Daily News*: "I knew this was going to occur," and "[i]t's just one quick fix after another— these bikes

are cheap."

55.     Cities had signed exclusive deals with Motivate or Lyft to operate their bikesharing system.  The Company's rivals, including Uber, have complained about these exclusive deals.  In addition to the potential rider injuries, monetary waste, and harm to the Company's market capitalization, these issues with Lyft's e-bikes increases the chance that cities will no longer sign exclusive deals with the Company.

**The Individual Defendants Make Misleading Statements**

56.     Lyft's IPO closed on April 2, 2019.  Through the IPO, the Company sold 32.5 million shares of its stock to the public at $72 per share for total proceeds of over $2.275 billion.  The IPO was conducted pursuant to the Offering Documents.  Defendants Green, Zimmer, Roberts, Aggarwal, Horowitz, Jarrett, Lawee, Mikitani, Miura-Ko, and Wilderotter signed the Offering Documents.  The Offering Documents contained misleading information and omitted material information that was required to be included.  In particular, the Offering Documents discussed risks to the Company that had already materialized concerning rider safety and the bikeshare program.

57.     Regarding the potential liability from riders, drivers, or third parties that are harmed due to Lyft, the Offering Documents stated:

> ***We could be subject to claims from riders, drivers or third parties that are harmed whether or not our platform is in use, which could adversely affect our business, brand, financial condition and results of operations.***
>
> We are regularly subject to claims, lawsuits, investigations and other legal proceedings relating to injuries to, or deaths of, riders, drivers or third parties that are attributed to us through our offerings. We ***may*** also be subject to claims alleging that we are directly or vicariously liable for the acts of the drivers on our platform. We ***may*** be subject to personal injury claims whether or not such injury actually occurred as a result of activity on our platform. For example, third parties have in the past asserted legal claims against us in connection with personal injuries related to the actions of a driver or rider who may have previously utilized our platform, but was not at the time of such injury. We have incurred expenses to settle personal injury claims, which we sometimes choose to settle for reasons including expediency, protection of our reputation and to prevent the uncertainty of litigating, and we expect that such expenses will continue to increase as our business grows and we face increasing public scrutiny.

58.     Concerning customer injuries, the Offering Documents stated:

***Personal Injury Matters***

In the ordinary course of our business, various parties have from time to time claimed, and may claim in the future, that we are liable for damages related to accidents or other incidents involving drivers or riders using or who have used services offered on our platform, as well as from third parties. We are currently named as a defendant in a number of matters related to accidents or other incidents involving drivers on our platform, other riders and third parties. In many of these matters, we believe we have meritorious defenses, dispute the allegations of wrongdoing and intend to defend ourselves vigorously. ***There is no pending or threatened legal proceeding that has arisen from these accidents or incidents that individually, in our opinion, is likely to have a material impact on our business, financial condition or results of operations;*** however, results of litigation and claims are inherently unpredictable and legal proceedings related to such accidents or incidents, in the aggregate, could have a material impact on our business, financial condition and results of operations. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs individually and in the aggregate, diversion of management resources and other factors.

59.     Just as egregious as the above misleading "warnings" was that Lyft failed to mention sexual assault at all in its Offering Documents, despite the Company facing a serious crisis over riders being assaulted.

60.     Concerning the e-bikes, the Offering Documents stated:

Our business in part depends on our ability to efficiently grow and further develop our network of shared bikes and scooters, which ***may*** not grow as we expect or become profitable over time.

61.     In discussing the potential "Risk Factors" that could adversely affect the Company's growth and financial condition, the Offering Documents provided:

[T]he market for our other offerings, such as our network of shared bikes bike and scooters, is new and unproven, and it is uncertain whether demand for bike and scooter sharing will continue to grow and achieve wide market acceptance. Our success will depend to a substantial extent on the willingness of people to widely-adopt ridesharing and our other offerings. If the public does not perceive our ridesharing or our other offerings as beneficial, or chooses not to result them as a result of concerns regarding safety, affordability, or other reasons, whether as a result of incidents on our platform or on our competitors' platforms or otherwise, then the market for our offering ***may*** not further develop, ***may*** develop more slowly than we expect or ***may*** not achieve the growth potential we expect, any of which could adversely affect our business, financial condition and results of operations.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

62.     Similarly, the Company disclosed the "risk" that it might not achieve growth and profitability "[e]ven if we are able to successfully develop and implement our network of shared bikes and scooters," but couched this "risk" in hypothetical terms by stating:

> [T]here may be heightened public skepticism of this nascent service offering. In particular, there could be negative public perception surrounding bike and scooter sharing, including the overall safety and the potential for injuries occurring as a result of accidents involving an increased number of bikes and scooters on the road. Such negative public perception may result from incidents on our platform[.]

*     *     *

> Our bikes and scooters or components thereof, including bikes and scooters and components that we design and contract to manufacture using third party suppliers, may experience quality problems or defects from time to time, which could result in decreased usage of our network of shared bikes and scooters. There can be no assurance we will be able to detect and fix all defects in our bikes and scooters. Failure to do so could result in lost revenue, litigation or regulatory challenges, including personal injury or products liability claims, and harm to our reputation.

63.     The Offering Documents also disclosed the "risk" that "[o]ur bikes and scooters may experience quality problems from time to time, which could result in product recalls, injuries, litigation, enforcement actions and regulatory proceedings, and could adversely affect our business, brand, financial condition and results of operations."  In particular the Offering Documents stated:

> We design and contract to manufacture, and directly and indirectly modify, maintain and repair, bikes and scooters for our network of shared bikes and scooters. Such bikes and scooters may contain defects in their design, materials and construction or may be improperly maintained or repaired.  These defects or improper maintenance or repair could unexpectedly interfere with the intended operations of the bikes or scooters, which could result in injuries to riders.

64.     In describing the "risk" of claims from riders of Lyft's bikes, the Offering Documents hypothetically warned:

> As we expand our network of shared bikes and scooters, we may be subject to an increasing number of claims, lawsuits, investigations or other legal proceedings related to injuries to, or deaths of, riders of our bikes and scooters. Any such claims arising from the use of our bikes and scooters, regardless of merit or outcome, could lead to negative publicity, harm to our reputation and brand, significant legal, regulatory or financial exposure or decreased use of our bikes and scooters.

65.     On May 7, 2019, Lyft issued a press release announcing its first quarter of 2019 financial results.  The Company held an earnings conference call that same day.  During the call, defendant Zimmer

highlighted the Company's "exclusive bikeshare operating contracts" as an example of an "area[] of execution that [is] helping [the Company] grow fast at scale."

66.     On May 14, 2019, Lyft filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2019 with the SEC.  The Form 10-Q purported to disclose the risks the Company may face in the future.  In particular, it stated:

> *Our reputation, brand and the network effects among the drivers and riders on our platform are important to our success, and if we are not able to continue developing our reputation, brand and network effects, our business, financial condition and results of operations could be adversely affected.*
>
> We believe that building a strong reputation and brand as a safe, reliable and affordable platform and continuing to increase the strength of the network effects among the drivers and riders on our platform are critical to our ability to attract and retain qualified drivers and riders. The successful development of our reputation, brand and network effects will depend on a number of factors, many of which are outside our control. Negative perception of our platform or company may harm our reputation, brand and networks effects, including as a result of:
>
> • complaints or negative publicity about us, drivers on our platform, riders, our offerings or our policies and guidelines, even if factually incorrect or based on isolated incidents;
>
> *             *             *
>
> • a failure to operate our business in a way that is consistent with our values and mission;
>
> • inadequate or unsatisfactory user support service experiences;
>
> • illegal or otherwise inappropriate behavior by our management team or other employees or contractors;
>
> *             *             *
>
> *We rely on third-party background check providers to screen potential drivers, and if such providers fail to provide accurate information or we do not maintain business relationships with them, our business, financial condition and results of operations could be adversely affected.*
>
> *             *             *
>
> Any negative publicity related to any of our third-party background check providers, including publicity related to safety incidents or data security breaches, could adversely affect our reputation and brand, and could potentially lead to increased regulatory or litigation exposure. Any of the foregoing risks could adversely affect our business, financial condition and results of operations.
>
> *             *             *
>
> *Our company culture has contributed to our success and if we cannot maintain this culture as we grow, our business could be harmed.*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

We believe that our company culture, which promotes authenticity, empathy and support for others, has been critical to our success. We face a number of challenges that may affect our ability to sustain our corporate culture, including:

\*      \*      \*

If we are not able to maintain our culture, our business, financial condition and results of operations could be adversely affected.

\*      \*      \*

**_We could be subject to claims from riders, drivers or third parties that are harmed whether or not our platform is in use, which could adversely affect our business, brand, financial condition and results of operations._**

We are regularly subject to claims, lawsuits, investigations and other legal proceedings relating to injuries to, or deaths of, riders, drivers or third parties that are attributed to us through our offerings. We may also be subject to claims alleging that we are directly or vicariously liable for the acts of the drivers on our platform. We may be subject to personal injury claims whether or not such injury actually occurred as a result of activity on our platform. For example, third parties have in the past asserted legal claims against us in connection with personal injuries related to the actions of a driver or rider who may have previously utilized our platform, but was not at the time of such injury. We have incurred expenses to settle personal injury claims, which we sometimes choose to settle for reasons including expediency, protection of our reputation and to prevent the uncertainty of litigating, and we expect that such expenses will continue to increase as our business grows and we face increasing public scrutiny.

\*      \*      \*

**_Personal Injury Matters_**

\*      \*      \*

There is no pending or threatened legal proceeding that has arisen from these accidents or incidents that individually, in our opinion, is likely to have a material impact on our business, financial condition or results of operations; however, results of litigation and claims are inherently unpredictable and legal proceedings related to such accidents or incidents, in the aggregate, could have a material impact on our business, financial condition and results of operations. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs individually and in the aggregate, diversion of management resources and other factors.

67.     Regarding the Company's bikeshare efforts, the Form 10-Q stated:

**_Our bikes and scooters may experience quality problems from time to time, which could result in product recalls, injuries, litigation, enforcement actions and regulatory proceedings, and could adversely affect our business, brand, financial condition and results of operations._**

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

We design and contract to manufacture, and directly and indirectly modify, maintain and repair, bikes and scooters for our network of shared bikes and scooters. Such bikes and scooters may contain defects in their design, materials and construction or may be improperly maintained or repaired. These defects or improper maintenance or repair could unexpectedly interfere with the intended operations of the bikes or scooters, which could result in injuries to riders.

\*     \*     \*

As we expand our network of shared bikes and scooters, we may be subject to an increasing number of claims, lawsuits, investigations or other legal proceedings related to injuries to, or deaths of, riders of our bikes and scooters. Any such claims arising from the use of our bikes and scooters, regardless of merit or outcome, could lead to negative publicity, harm to our reputation and brand, significant legal, regulatory or financial exposure or decreased use of our bikes and scooters.

68.     The truth was, however, that these risks had already arisen at the time of the Offering Documents.  Thus, by couching current events as hypothetical risks that might occur in the future, the Individual Defendants misled the market.

69.     As reports emerged of Lyft's widespread problems with safety, including the additional reports of sexual assaults, and issues with its e-bikes, the Company's stock price fell precipitously.  By May 17, 2019, when the securities class action was filed, Lyft's stock price had fallen to $53.79 per share, over $18 below its IPO price.

70.     Notably, on September 8, 2020, the court in the Securities Class Action denied the defendants' motion to dismiss as it applied to these "risk disclosure"-based statements.  This denial substantially increases the likelihood that Lyft will have to pay substantial amounts to defend and resolve the Securities Class Action.

## DAMAGES TO LYFT

71.     As a result of the Individual Defendants' improprieties, Lyft operated without adequate safety controls, exposed its female drivers and riders to sexual assaults and threatened its e-bike customers with bodily injury.  In addition, the Individual Defendants disseminated improper, public statements that misleadingly presented current events as future possible risks.

72.     As a direct and proximate result of the Individual Defendants' actions, Lyft has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

(a)   costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(b)   costs incurred from defending and paying any settlements in the sexual assault litigation;

(c)   costs incurred from defending and paying any settlements in personal injury cases resulting from the defective e-bikes;

(d)   fines or other penalties imposed by customers due to Lyft not being able to deliver on promised e-bike systems; and

(e)   costs incurred from compensation and benefits paid to the defendants who have breached their duties to Lyft.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

73.   Plaintiff brings this action derivatively in the right and for the benefit of Lyft to redress injuries suffered, and to be suffered, by Lyft as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Lyft is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

74.   Plaintiff will adequately and fairly represent the interests of Lyft in enforcing and prosecuting its rights.

75.   Plaintiff has continuously been a stockholder of Lyft since March 2019.

76.   The current Board of Lyft consists of the following seven individuals: defendants Aggarwal, Green, Zimmer, Jarrett, Lawee, Miura-Ko, and Wilderotter.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Aggarwal, Green, Zimmer, Jarrett, Lawee, Miura-Ko, and Wilderotter Face a Substantial Likelihood of Liability for Their Misconduct**

77.   As alleged above, defendants Aggarwal, Green, Zimmer, Jarrett, Lawee, Miura-Ko, and Wilderotter breached their fiduciary duties of loyalty by making improper statements in the Company's SEC filings.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

78.     The Company's reputation is a mission critical aspect in distinguishing Lyft from its main competitor Uber.  Despite this fact, defendants Aggarwal, Green, Zimmer, Jarrett, Lawee, Miura-Ko, and Wilderotter allowed Lyft to operate without appropriate safety controls, which in turn allowed women to be harassed and assaulted.  They allowed Lyft to continue to operate in this manner even as the red flags continued to arise through lawsuits and articles about the sexual harassment and assaults occurring to Lyft's female customers and drivers.  Accordingly, defendants Aggarwal, Green, Zimmer, Jarrett, Lawee, Miura-Ko, and Wilderotter face a substantial likelihood of liability.

79.     In addition, as explained above and in the Offering Documents, the Company's major purchase of Motivate and bringing the e-bikes online was critical for Lyft.  Nevertheless, defendants Aggarwal, Green, Zimmer, Jarrett, Lawee, Miura-Ko, and Wilderotter breached their duty of loyalty by allowing the Company to operate the e-bikes without a proper braking system in place.

80.     Defendants Aggarwal, Jarrett, and Wilderotter, as members of the Audit Committee, reviewed and approved the improper statements.  The Audit Committee's Charter provides that it is responsible for overseeing Lyft's compliance with applicable laws.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements, the lack of safety controls, and deficient e-bikes.  Accordingly, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**The Board Cannot Independently Consider a Demand**

81.     Defendants Green and Zimmer are co-founders and executives at the Company.  They face a substantial likelihood of liability as officers of the Company for the wrongdoing described herein, acts that are not exculpated under section 102(b)(7) of the Delaware General Corporation Law.  Together, defendants Green and Zimmer own a combined 37.5% of the Company's voting power.

82.     Defendant Lawee is a partner of CapitalG, a growth equity fund.  Defendant Miura-Ko is the co-founder and partner at Floodgate Fund LP, a venture capital firm.  Delaware law has recognized the unique nature of private equity funds like CapitalG and Floodgate Fund that compete to invest in early startups.  These funds risk future investment opportunities if their members vote to initiate litigation against founders of companies in which they invest.  Accordingly, defendants Lawee and Miura-Ko will not vote to initiate litigation against defendants Green or Zimmer.

83.    Plaintiff has not made any demand on the other stockholders of Lyft to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Lyft is a publicly held company with over 308 million shares outstanding and thousands of stockholders as of November 9, 2020;

(b)    making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)    making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

84.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

85.    The Individual Defendants owed and owe Lyft fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Lyft the highest obligation of care and loyalty.

86.    The Individual Defendants and each of them, violated and breached their fiduciary duties.

87.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Lyft has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

88.    Plaintiff, on behalf of Lyft, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

89.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

90.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Lyft.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Lyft.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

91.     Plaintiff, as a stockholder and representative of Lyft, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

92.     Plaintiff, on behalf of Lyft, has no adequate remedy at law.

### COUNT III

**Against the Individual Defendants for Contribution Pursuant to
Section 11(f) of the Securities Act and Section 21D of the Exchange Act**

93.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

94.     Due to the conduct and events alleged herein, the Company has been named as a defendant in the securities class actions brought on behalf of Lyft stockholders in which the Company is a joint tortfeasor in claims brought under sections 11, 12(a)(2), and 15 of the Securities Act.  Federal law provides Lyft with a cause of action against other alleged joint tortfeasors under section 11(f) of the Securities Act.

95.     The plaintiffs in the securities class actions allege that the Offering Documents for the IPO were inaccurate and misleading, included untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

96.     The Individual Defendants named herein were responsible for the contents and dissemination of the Offering Documents.  Lyft is the registrant for the IPO.

97.     As issuer of the shares, Lyft is strictly liable to plaintiffs and the class for the misstatements and omissions alleged in the securities class actions.

98.     The plaintiffs in the securities class actions allege that none of the Individual Defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

99.    The Individual Defendants, because of their positions of control and authority as officers and directors of Lyft, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Lyft, including the wrongful acts complained of herein and in the securities class actions.

100.    Thus, the Individual Defendants are liable under section 11(f) of the Securities Act, U.S.C. §77k(f)(1), which imposes a private right of action for contribution, and section 21D of the Exchange Act, 15 U.S.C. §78u-4(f), which allows for the application of a private right of action for contribution arising out of violations of the Securities Act.   As such, Lyft is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Lyft, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, unjust enrichment, and contribution;

B.    Directing Lyft to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Lyft and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over financial reporting;

2.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.    a provision to permit the stockholders of Lyft to nominate at least three candidates for election to the Board; and

4.    a proposal to strengthen Lyft's oversight of its disclosure procedures;

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on,

1  or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure

2  that plaintiff on behalf of Lyft has an effective remedy;

3       D.     Awarding to Lyft restitution from defendants, and each of them, and ordering

4  disgorgement of all profits, benefits, and other compensation obtained by the defendants;

5       E.     Awarding to plaintiff the costs and disbursements of the action, including reasonable

6  attorneys' fees, accountants' and experts' fees, costs, and expenses; and

7       F.     Granting such other and further relief as the Court deems just and proper.

8  

**JURY DEMAND**

9       Plaintiff demands a trial by jury.

10  Dated: February 22, 2021

          ROBBINS LLP

11            BRIAN J. ROBBINS
          STEPHEN J. ODDO
          ERIC M. CARRINO

12

13                    /s/*Brian J. Robbins*
              BRIAN J. ROBBINS

14

15            5040 Shoreham Place
          San Diego, CA 92122

16            Telephone: (619) 525-3990
          Facsimile (619) 525-3991

17            E-mail: brobbins@robbinsllp.com
               soddo@robbinsllp.com

18                 ecarrino@robbinsllp.com

19            Attorneys for Plaintiff

1507667

20

21

22

23

24

25

26

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## **VERIFICATION**

I, Brad Shuman, hereby declare as follows:

I am the plaintiff in this action.  I have read the verified stockholder derivative complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:_____2/9/2021_____

DocuSigned by:

*Brad Shuman*

363995BEC9C84B1...

_____   _____

BRAD SHUMAN